UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 12 CV 5380

WILLIAM MEIERFELD,
individually and on behalf of
all persons similarly situated,

 12 Civ. _____

          Plaintiff,

    -against-

TERM COMMODITIES, INC., ALLENBERG
COTTON COMPANY, JOSEPH NICOSIA,
LOUIS DREYFUS COMMODITIES, B.V.,
LOUIS DREYFUS COMMODITIES LLC,
AND JOHN DOES NOS. 1-10,

        Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
JUL 12 2012
U.S.D.C. S.D. N.Y.
CASHIERS

William Meierfeld ("Plaintiff") complains, upon knowledge as to himself and his own

acts, and upon information[1] and belief as to all other matters, as follows:

## I.    SUMMARY OF ALLEGATIONS

1.    In violation of the Commodity Exchange Act, 7 U.S.C. §§1, et seq. ("CEA"),

Defendants (as defined in ¶¶ 12-17) manipulated and artificially inflated the prices of:

    **a)**    The Intercontinental Exchange ("ICE") Cotton No. 2 futures contract

("cotton futures contract") expiring in May 2011 ("May 2011 Contract"), relative to the other

prices alleged hereinafter; and

---

[1] Plaintiff's information includes the investigation of counsel based upon public available
information about cotton prices, cotton futures deliveries, data on cotton exports and imports,
and other statistics.

**b)**     The cotton futures contract expiring in July 2011 ("July 2011 Contract"), relative to the other prices alleged hereinafter.

**c)**     Allegations herein of Defendants' artificial inflation, manipulation or fixing of the prices of May 2011 Contracts refer to the March 30-May 6, 2011 period, inclusive. Allegations of such conduct by Defendants towards July 2011 Contract prices refer to the period June 7, 2011 to July 7, 2011, inclusive. The period from March 30 to May 6, 2011, inclusive, and the period from June 7 to July 7, 2011, inclusive, are referred to herein as the "Class Period." Whenever artificial inflation is alleged, that means inflation relative to the fundamentals of supply and demand, the prices of the later futures contract, and/or cash market prices, each as alleged in detail hereinafter.

2.     Defendants' manipulation also violated Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 & 2) and artificially inflated the fixing of the prices of cotton on call contracts alleged in ¶¶ 112-118.

3.     Cotton is seasonal, with supplies in the United States peaking after the harvest or picking is substantially complete in September. Cotton supplies in the United States tend to be at their lowest at the end of July before substantial picking of the new crop has begun. One of the promised societal benefits of cotton merchants and cotton futures contract trading is that they efficiently and economically allocate the substantial supplies of cotton in September in a manner that provides the lowest price of cotton throughout the year.

4.

2

**a)**     Here, however, Defendants uneconomically insisted in the May 2011 Contract upon the highest number of stops of deliveries (which means that Defendants received actual delivery of the cotton underlying the futures contract) relative to the amount of certificated cotton stocks in ICE warehouses in the history of cotton futures trading on ICE.

**b)**     Specifically, Defendants, through Defendant Term Commodities, Inc., stopped 3,898 May 2011 Contract deliveries in satisfaction of Defendants' long positions in the May 2011 Contract, *See* ¶20, *infra* (defining "long position") and ¶¶42-44, *infra* (particularizing the deliveries). This was 99.23% of all the deliveries on the May 2011 Contract.

**c)**     The deliveries taken by Defendants alone on the May 2011 Contract were 2.02 times the certificated cotton stocks at the start of the notice period. This was 56% greater than the next highest ratio of (i) all deliveries made to all participants in any prior ICE contract, to (ii) the amount of certificated stocks in the ICE warehouse at the start of the notice period.

**d)**     Abnormal differences between the price of one futures contract on a commodity and the price of a later-expiring futures contract for that same commodity, is the most important or one of the most important indications of price manipulation. A substantial "backwardation"[2] is a classic indicator of a manipulation by taking a large amount of deliveries relative to the amount of commodity in the warehouse.

---

[2] A "backwardation" is a condition in which the price or the earliest expiring futures contract price exceeds the prices of later expiring futures contracts. In contrast to a backwardation, a "carrying charge" means that the price of the later expiring futures contracts are higher than the price of the earliest expiring futures contract. This is called a "contango" or, often, a "carrying

**e)**     Defendants' record ratio of deliveries caused May 2011 Contract prices relative to July 2011 Contract prices to move to the highest percentage backwardation and the highest absolute backwardation of any May-July Contract in the history of cotton futures trading for the time period of April 1 - May 6 of each year from 2000 - 2011, inclusive.

**f)**     The system of futures contract trailing in the United States is designed to facilitate the ease of trading and avoid deliveries. See ¶¶ 17-24, *infra.* After "backwardation," another indication of manipulated futures contract prices in the United States has been that futures contract prices diverge from the cash market price as the futures contract moves closer to the month before trading ends. As time progresses and each futures contract moves towards its final trailing month, there is less of a "predictive" or "anticipatory" component of the futures price. Accordingly, non-manipulated futures contract prices and cash market prices should tend to converge during the month before the end of trading in a given contract.

**g)**     By insisting upon taking their record ratio of deliveries of May 2011 Cotton Contracts relative to the certificated supplies in the warehouse, Defendants caused (i) a record non-convergence between the May 2011 Contract price and cash market prices, and (ii) an anomalous distortion between May 2011 prices and the fundamentals of supply and demand. See ¶¶ 53-85, *infra.*

---

charge" market because the somewhat higher prices of the deferred contracts, compensate the holder of the commodity for the "carrying charges" of continuing to store the commodity (here. cotton) until the later delivery dates.

4

**h)**      Thus, Defendants' record ratio of deliveries on the May 2011 Contract caused record distortions of prices and uneconomic conditions in which the May 2011 Contract blatantly violated the overriding "convergence" objectives (see sub-parts **f)** and **g)**, *supra*) of United States futures contract trading.  This is the type of abuse of market power by a large trader that Congress originally enacted the CEA to prevent, and has been seeking through amendments to the CEA to eliminate since the inception of the CEA.

5.      **a)**      Defendants, through Defendant Term Commodities, Inc., then topped their own record set in the May 2011 Contract by uneconomically insisting upon an even greater amount of stops of deliveries relative to certificated stocks on the July 2011 Contract. See ¶¶ 42-44, *infra.*

**b)**      Specifically, Defendants stopped 1,613 July 2011 Contract deliveries in satisfaction of their long positions in the July 2011 Contract.  This was **99.01%** of the stops of deliveries on the July 2011 Contract.

**c)**      Defendants' stops of deliveries on the July 2011 Contract alone were 2.04 times more than the certificated stocks at the start of the notice period.

**d)**      Thereby, Defendants caused an anomalous "U-turn" in the backwardation between the prices of July 2011 Contracts and the prices of the next two cotton futures contracts.

**e)**      From March 2011 forward, there had been net cancellations of exports of cotton. See n. 5, *infra.*  These added to the supply of cotton and reduced the demand for cotton. Consistent with these and other changes in the fundamentals of supply and demand for cotton (¶ 73, *infra*), the backwardation between the July 2011 Contract price and the prices of the next two

5

expiring futures contracts (the October 2011 and December 2011 Contracts) declined between March and early June 2011.

**f)**    However, Defendants' threatened and actual insistence on high amounts of deliveries on the July 2011 Contract caused the backwardation to do a U-turn. Anomalously, this occurred even as the net cancellations of exports continued and other changes in the fundamentals of supply and demand indicated that the backwardation should decline.

**g)**    Defendants caused this backwardation between the July 2011 Contract price and the prices of the next two expiring futures contracts (the October 2011 and December 2011 Contracts) to become higher than the backwardation between any same year July-October contract prices or any same year July-December contract prices for the period from June 1-July 6 of each year from 2000-2011, inclusive.

**h)**    In fact, Defendants' record ratio of deliveries also artificially created and intensified a substantial non-convergence between the July 2011 Contract prices and cash market prices. Indeed, during the time period of June 1 - July 6 for the twelve years of 2000 through 2011, the thirteen highest spreads between the July cotton futures contract and the cash market cotton price were all in the July 2011 cotton futures contract. The largest spread during the Class Period was reached on June 23, 2011. It was almost five times greater more than the highest spread in all the years prior to 2011, going back to 2000. It was more than ten times the average spread price during the same, 2000-2010 time period.

**i)**    This gross distortion to record non-convergence and unprecedented spreads, exactly when prices should have been converging, is yet another extreme badge of manipulation.

6

**j)**    In causing all the foregoing extreme distortions, Defendants intentionally manipulated and inflated July 2011 contract prices. As in the May 2011 Contract, Defendants also intentionally exacerbated and abused the pre-existing conditions of relatively low supplies and capacity constraints to further manipulate and inflate July 2011 Contract prices.

6.

**a)**    By virtue of their foregoing conduct, Defendants deprived the public of the benefits of non-manipulated futures contract prices. *See* ¶¶32-34, *infra.*

**b)**    As a direct and proximate result of Defendants' foregoing manipulation and unlawful conduct, and the resulting price distortions, Plaintiff and Class members suffered actual damages and were damaged in their property.

## II.    JURISDICTION AND VENUE

7.    Cotton is a "commodity" and is the "commodity underlying" cotton futures and options contracts traded on the Intercontinental Exchange ("ICE"). The ICE operates the ICE Futures U.S. in this District. ICE Futures U.S. is a designated contract market pursuant to the Commodity Exchange Act ("CEA"), as amended, and, as such, is regulated by the Commodity Futures Trading Commission ("CFTC"). *See* Sections la(4) & 22 of the CEA, 7 U.S.C. §§ la(4) & 25(a)(l)(D).

8.    ICE Futures U.S.'s headquarters are located at 1 North End Avenue, New York, NY 10282. Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), because the claims arose in this District. Defendants' unlawful acts manipulated the prices of the Cotton futures contracts traded on the ICE.

7

9.  This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and pursuant to 28 U.S.C. §§ 1331 and 1337.

10.  The Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## III.  PARTIES

### A.  Plaintiffs

11.  Plaintiff William Meierfeld is a resident of the State of New York. Plaintiff is a member of the Proposed Class, having traded in May 2011 and July 2011 cotton contracts during the Class Period alleged herein. Plaintiff Meierfeld lost substantial sums of money and suffered actual damages by paying the artificially high prices caused by Defendants. Defendants' manipulation and artificial inflation of the prices of cotton futures contracts proximately caused Plaintiff's losses, injury to his property and actual damages.

### B.  Defendants

12.  Defendant Louis Dreyfus Commodities B.V. ("LDC") trades and markets commodities, including cotton, on an international basis. The LDC group's cotton platform conducts operations in all major world markets, including origination in key producing regions of the United States and other countries. LDC originates approximately 20% of United States cotton production. LDC's main office is located in Rotterdam, The Netherlands.

8

13.     Defendant Allenberg Cotton Co. ("Allenberg") is a wholly owned division or subsidiary of LDC and is one of the largest cotton merchandising organizations in the world. Allenberg has offices in Cordova, Tennessee and Fresno, California.

14.     Defendant Term Commodities, Inc. is a subsidiary of LDC. Term Commodities is a clearing member on the InterContinental Exchange, Inc. ("ICE"), the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange ("CME"), and the New York Mercantile Exchange ("NYMEX"). Term Commodities is located in Chicago, Illinois. Term Commodities does not act for public customers. It acts for the other Defendants and their affiliates.

15.     Defendant Louis Dreyfus Commodities LLC is a holding company for various operating companies engaged in the North American business with the Louis Dreyfus Commodities group of companies. Louis Dreyfus Commodities LLC's main office is located in Wilton, Connecticut.

16.     Defendant Joseph Nicosia ("Nicosia") was the Chief Executive Officer of Allenberg at all times relevant herein, and is the Senior Platform Head Cotton of the Louis Dreyfus Commodities' Executive Group within Louis Dreyfus Commodities Holdings BY and LDC. According to Bloomberg, Defendant Nicosia, who was in charge of Defendants' cotton futures trading, also serves as a Director of both the New York Board of Trade and the American Cotton Shippers. Defendant Nicosia served as a Member of Board of Governors of Ice Futures U.S. (formerly, New York Board of Trade). Mr. Nicosia also a founding member and director of The SEAM, the cotton industry's internet trading marketplace.

17.     Defendants John Does 1 -10 are other persons, whose identities are unknown to Plaintiff. John Does 1-10 include but are not limited to affiliates or associates of Defendants

9

Louis Dreyfus Commodities B.V., Louis Dreyfus Commodities LLC, Term Commodities Inc.,

Allenberg Cotton Co., and Joseph Nicosia. The John Doe defendants agreed to and did work

with the specifically named defendants to manipulate prices of May 2011 Contracts and July

2011 Contracts, and otherwise accomplish the violations alleged herein. The specifically named

defendants and the John Doe defendants are referred to herein collectively as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

18.    **Futures Contract**. A futures contract is an agreement to buy or sell a

commodity, such as cotton, at a date in the future. In practice, however, only a very small

percentage of all futures contracts traded each year are satisfied by delivery of the underlying

commodities.

19.    **Offset By Trading.** Rather, futures market participants almost always offset their

futures positions before their contracts mature. For example, a purchaser of one cotton futures

contract may cancel or offset her future obligation to take delivery of cotton, by selling one

cotton futures contract. This sale of one contract offsets or liquidates the earlier purchase of one

contract. The difference between the initial purchase price and the sale price represents the

realized profit or loss for the trader. Futures traders also frequently couple such liquidations with

"roll" trades. See ¶¶51-52, *infra*.

20.    **"Long" and "Short."** Thus, futures contracts have two sides. The "long" side is

the buyer of the contract. In the rare event that the long does not offset or liquidate, the long is

obligated to take delivery and pay for the commodity. The "short" side is the seller of the

contract. In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

21.    However, the commodity exchanges and the CFTC have repeatedly stated that futures markets are not intended to be substitutes for the physical market. Instead, the futures markets are carefully designed to facilitate ease of trading into and out of futures contract positions without deliveries. As a result, deliveries are rare.

22.    The insistence by "longs" on stopping (that is, taking) significant deliveries to satisfy expiring futures contracts, does not make economic sense in various circumstances. These include where the price of the expiring futures contract is more than the prices of the deferred futures contracts, or more than the price of purchasing cotton in the cash market. See ¶¶ 34-36, 63, 71, 78(d), *infra.*

23.    "Spread positions" are commonly used positions. Typically, in a spread position, the trader is long a futures contract for one delivery month and short the same futures contract for another delivery month.

24.    "Spreads" may refer to the price differential between any two items. For example, "spreads" refers to the price differences between futures contracts on the same item only with different expirations. Thus, if the May 2011 Contract were priced at $2.50 per pound and the July 2011 Contract were priced at $3.00 per pound, then the spread would be 50¢; if the July 2011 Contract were priced at $2.50 per pound and the December 2011 Contract were priced at $2.60 per pound, then the spread would be .10¢ per pound. Similarly, "spreads" may refer to the difference between the cash market price and the futures market price if the July 2011 Contract

11

price was $2.50 per pound and the cash market price was $2.46 per pound, the spread would be .04¢ per pound.

25.     ICE Futures U.S. has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. ICE Futures U.S. submits to the CFTC various rules and regulations for approval through which the ICE designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and options contracts for cotton.

26.     ICE trades cotton futures contracts expiring in March, May, July, October and December of each year.

27.     Every aspect of a futures contract traded on the ICE, such as the grade and amount of cotton, is standardized, except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place.

28.     Prices of ICE cotton futures contracts are quoted in cents and hundredths of a cent per pound. The contract size for ICE cotton futures contracts is 50,000 pounds net weight.

29.     ICE Cotton No. 2 rules specify that the Official Cotton Standards of the United States existing on the date of delivery shall be used as the standards for the grade, staple, quality or value of all cotton delivered on a contract for future delivery. *See* ICE Futures U.S. Cotton No. 2 Rules, Rule 10.03 (Official Standards and Undeliverable Cotton).

30.     Thus, in the rare event that a market participant holds its positions to the end of trading in the prompt-month contract, the longs must stop or take delivery and shorts must make delivery of 50,000 pounds net weight pet contract at one of the specified delivery points. The

12

price for the cotton that is delivered is the settlement price of the ICE Cotton No. 2 contract. The difference between that and each trader's original price has been adjusted for, through variation margin payments.

31.     All ICE warehouses for cotton are required to load-out cotton within nine weeks from the date of receipts of a valid load-out order.

13

### B.     **Manipulation**

32.     The social benefits that justify commodity futures trading are (a) price discovery; (b) efficient risk-transfer, and (c) price stabilization. See *Cargill. Inc. v. Hardin,* 452 F.2d 1154, 1156-58 (8th Cir. 1971).

33.     Price manipulation destroys all three of these benefits. *Cargill*, 452 F.2d at 1156-58. Defendants' insistence upon record numbers of deliveries relative to ICE warehouse certified stocks caused record non-convergence between futures and cash market prices, record backwardation in the futures market, and a dramatic separation of the futures prices from the fundamentals of supply and demand for cotton. Thereby, Defendants destroyed the social benefits of cotton futures contract trading in order to benefit Defendants.

34.     **Uneconomic Conduct**.  Standard practice among merchants (and other business entities) is to purchase a commodity for the lowest price available, all other things equal, and sell the commodity for the highest price available, all other things equal.  Firms acting in accordance with this standard practice are said to be acting in an "economic" or "economically rational" manner.  Firms that violate this standard practice are said to be acting uneconomically pursuant to their manipulative scheme alleged herein, Defendants repeatedly engaged in highly unusual violations of this standard  practice by seeking uneconomically to overpay to purchase cotton by taking delivery on, first, the May 2011 Contract, and, later, the July 2011 Contract.

35.     Efficient risk-transfer and the other social benefits of futures trading alleged in ¶¶31-32, cannot be realized in a regime in which uneconomic deliveries cause non-convergence of cash and futures prices.  In such a regime of uneconomic deliveries and non-convergence, each hedger would have to maintain a "double book."  For every short position, the hedger would

14

have to keep certificated supplies that could be used to deliver in order to liquidate the short futures positions-and avoid having to liquidate at non-converging futures prices. For every long position, the hedger would have to maintain the substantial spare cash and credit necessary to take delivery and purchase the entire amount of the commodity represented by the long futures position-and thereby avoid having to liquidate at non-converging futures prices. Maintaining such "double books" would enable hedgers to exit a hedging futures position without sustaining large losses. But maintaining such double books would be extremely expensive, and make the economic cost of hedging in the futures market outweigh the benefits.

36.     Furthermore, in a regime of uneconomic deliveries and non-convergence, the futures contract would be useful only as a hedge for ICE warehouse cotton, and not for out-of-position cotton. However, warehouse stocks represent only a small fraction of the overall total cotton stocks. The overwhelming majority of cotton is "out-of-position", i.e., outside the ICE warehouse, in non-deliverable locations, of non-deliverable grades. Limiting effective hedges to deliverable cotton would effectively end the risk-transfer function of the cotton futures market and ultimately would end cotton futures trading.

C.     **Convergence, Issues of Certificates, and Stops of Certificates**

37.     **Absence of Safe Harbors.** CEA manipulation law and the convergence of futures contract prices and cash market prices each supersede the sometimes asserted right of large traders to insist on receiving or making significant amounts of deliveries. Manipulation is a separate violation. Manipulation is not derivative. That is, manipulation does not depend upon whether the alleged manipulator claims to have followed all of the other rules. Nor does it depend on whether the alleged manipulator did in fact follow all of the other rules. Rather, if the

15

participant intends to and does cause artificial prices or artificial price trends, then the participant has manipulated prices. If the participant intended to do and did the foregoing, there are no safe harbors.

38.      Although convergence is a hallmark and a primary objective of futures contract trading in the United States, the custom and practice of the commodity exchanges and the CFTC have been not to intervene in trading when manipulation is suspected (except in emergency situations). Instead, the exchanges and the CFTC have typically allowed the market to "trade out". After the market has traded out, private parties and others (including the CFTC) may allege that violations of the law or rules against manipulation have occurred or that other deleterious acts occurred.

39.      In the foregoing context, on each trading day, the ICE cotton delivery notices market data reports reflect the number of contracts stopped and issued as of such day and cumulatively by clearing members.[3]

40.      The daily ICE cotton futures contract issues and stops relate to the deliveries of cotton against expiring contracts traded on ICE Futures U.S. in New York. The notices reflect the movement of cotton to offset each long or short futures position. Issuers make deliveries, and stoppers take deliveries.

41.      The May 2011 Contract ceased trading on May 6, 2011, and First Notice Day ("FND") was April 25, 2011, and the first delivery date on such contract was May 2, 2011. The

---

[3] *See* https:www.theice.com/marketdata/reports/ReportCenter.shtml.

16

FND of the July 2011 Contract was June 24, 2011, the first delivery date of such contract was July 1, 2011, and the last trade date of such contract was July 7, 2011.

D.   **Additional Facts of Defendants' Manipulation**

    1.   **Defendants Took Delivery of Over 99% of the ICE May 2011 Cotton No. 2 Contract**

42.   Between April 25, 2011 and May 13, 2011, the issuers making deliveries filed notices in respect of 3,928 May 2011 ICE Cotton No. 2 contracts and the stoppers taking deliveries filed notices in respect of the same amount of such contracts. The breakdown of issues and stops by clearing member firms are set forth below. Defendant Term Commodities took delivery of almost 100% of the May 2011 ICE Cotton No. 2 contract.

    a. **The Issuance by Clearing Members Firms.** ICE clearing members issued notices relating to 3,928 May 2011 Contracts as follows:

| Issues by Firm | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | 25-Apr | 2-May | 4-May | 5-May | 6-May | 9-May | 10-May | 11-May | 12-May | 13-May |
| ADM Investor Services | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 17 |
| Citigroup Global Markets, Inc. | 7 | 20 | 0 | 0 | 33 | 0 | 31 | 0 | 0 | 97 |
| JP Morgan | | | | | 203 | | | | | 374 |
| Merrill Lynch Futures Inc. | | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Morgan Stanley Co. Inc. | | 280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Newedge USA, LLC | | 1179 | 0 | 185 | 94 | 0 | 0 | 100 | 252 | 963 |
| Penterra Div, of FC Stone, LLC | | | | | | | | | | |
| RJ Obrien and Associates LLC | | | | | 1 | 11 | 3 | 0 | 0 | 58 |
| Term Commodities | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

18

| UBS Securities LLC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTALS | 13 | 1489 | 1 | 185 | 331 | 11 | 34 | 100 | 254 | 1510 |

b. **The Taking of Deliveries by Defendants**. Defendants, through Term Commodities, took delivery of 3,898 of 3,928. May 2011 Contracts (99.23% of stops by all clearing member firms) as follows:

| Stops By Firm | | | |
|---|---|---|---|
| Date | Term Commodities Commodities | All Other Clearing Members | Totals |
| 25-Apr | 13 | 0 | 13 |
| 2-May | 1481 | 8 | 1489 |
| 4-May | 1 | 0 | 1 |
| 5-May | 184 | 1 | 185 |
| 6-May | 329 | 2 | 331 |
| 9-May | 11 | 0 | 11 |
| 10-May | 34 | 0 | 34 |
| 11-May | 99 | 1 | 100 |
| 12-May | 252 | 2 | 254 |
| 13-May | 1494 | 16 | 1510 |
| **Totals** | 3898 | 30 | 3928 |

Source:  www.theice.com. The figures reflect the number of ICE contracts involved in deliveries. Each contract represents 50,000 pounds net weight.

19

2.   **Containing Their Pattern of Uneconomic Conduct, Defendants Took Delivery of Over 99% of the ICE July 2011 Contract**

43.   Between June 24, 2011 and July 14, 2011, the issuers making deliveries filed notices in respect of 1,629 July 2011 Contracts and the stoppers taking deliveries filed notices in respect of the same amount of such contracts. The breakdown in respect of issues and stops by clearing member firms and stops are set forth below. Defendant Term Commodities took delivery of nearly 100% of the July 2011 ICE Cotton No. 2 contract.

a.   **The Issuances by Clearing Member Firms.** ICE clearing members issued notices relating to 1,629 July 2011 Contracts as follows:

| | ISSUES BY FIRM | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 24-Jun | 27-Jun | 28-Jun | 29-Jun | 30-Jun | 1-Jul | 5-Jul | 6-Jul | 7-Jul | 8-Jul | 11-Jul | 12-Jul | 13-Jul | 14-Jul |
| ADM Investor Services | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Citigroup Global Markets, Inc. | | 10 | 6 | 0 | 0 | 0 | 0 | 10 | 1 | 0 | 5 | 4 | 15 | 153 |
| JP Morgan | 313 | 17 | 0 | 47 | 27 | 41 | 34 | 32 | 31 | 30 | 34 | 31 | 20 | 408 |
| Merrill Lynch Futures Inc. | | | | | | | | | | | | | | |
| Morgan Stanley   Co. | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inc. | | | | | | | | | | | | | | |
| Newedge USA, LLC | | | | | | | | | | | 29 | 0 | 0 | 0 |
| Penterra Div, of FC Stone, LLC | 145 | 0 | 0 | 0 | 0 | 0 | 0 | 98 | 0 | 0 | 38 | 0 | 0 | 44 |
| RJ Obrien and Associates LLC | | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Term Commodities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UBS Securities LLC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS | 459 | 29 | 7 | 47 | 27 | 41 | 34 | 140 | 32 | 30 | 106 | 35 | 35 | 607 |

b. **The Taking of Deliveries by Defendants**. Defendants, through Term Commodities, took delivery of 1,613 of 1,629 July 2011 Contracts (99.01%) of stops by all clearing member firms) as follows:

| Stops By Firm | | | |
|---|---|---|---|
| Date | Term Commodities | All Other Clearing Members | Totals |
| 24-Jun | 455 | 4 | 459 |
| 27-Jun | 28 | 1 | 29 |
| 28-Jun | 7 | 0 | 7 |
| 29-Jun | 47 | 0 | 47 |
| 30-Jun | 27 | 0 | 27 |
| 1-Jul | 41 | 0 | 41 |
| 5-Jul | 34 | 0 | 34 |
| 6-Jul | 139 | 1 | 140 |
| 7-Jul | 32 | 0 | 32 |
| 8-Jul | 30 | 0 | 30 |
| 11-Jul | 105 | 1 | 106 |
| 12-Jul | 35 | 0 | 35 |
| 13-Jul | 35 | 0 | 35 |
| 14-Jul | 598 | 9 | 607 |
| Totals | 1,613 | 16 | 1,629 |

Source: www.theice.com.  Again, the figures reflect the number of ICE contracts involved in deliveries.  Each contract represents 50,000 pounds net weight

44.     Almost all of the stopped deliveries for May and July were taken by a single clearing firm, Term Commodities, which is owned by other Defendants.  Plaintiff has good grounds to believe and does allege that Term was working for and on behalf of the Defendants. That is, from April 25, 2011 to May 13, 2011, the Defendants took delivery of 3,898 or 99.23%

22

of May 2011 Contracts, and from June 24, 2011 to July 14, 2011, the Defendants took delivery of 1,613 or 99.01% of May 2011 Contracts.

> **3.** **Defendants' Large Long Positions in May 2011 Contracts and July 2011 Contracts**

45. Defendants, through Term Commodities, not only were the dominant stopper of deliveries. Defendants also held dominant long positions in, first, the May 2011 Contract and, later, the July 2011 Contract. See ¶¶ 137-143, *infra*. Defendants did so, in part, as part of spread positions.

46. However, unlike with delivery information, information about a trader's long positions and other positions in the futures markets are not publicly posted. On the contrary, such information is regarded as confidential. Therefore, Plaintiff does not know and cannot learn, absent discovery, the exact dates or exact amounts of the purchases by Defendants of their large long positions.

47. Plaintiff has good grounds to believe and does allege that Defendants began to acquire significant long positions in the May 2011 Contract by late March 2011, and added to them thereafter as FND approached. Similarly, Plaintiff has good grounds to believe and does allege that Defendants began to acquire significant long positions in the July 2011 Contract by late May 2011, and added to them thereafter as FND approached.

48. Plaintiff's good grounds include the CFTC Commitment of Traders Reports, and the following facts.

49. During February 2011, the March 2011 Contract Futures Contract, as it approached the expiration of trading in such contract, gradually ceased to be the most actively traded cotton futures contract and gradually ceased to be the cotton futures contract with the

largest open interest. The May 2011 Contract then became the most actively traded cotton futures contract and the one with the most open interest.

50.     By the end of February or early March 2011, most of the market had liquidated their March 2011 Contract positions or "rolled" out of the March 2011 Contract and into the May 2011 Contract.

51.     To "roll," means that a trader makes the opposite trade of the position held in the expiring month (e.g., a person long one March 2011 Contract would sell one March 2011 Contract), and simultaneously executes a transaction for the same position in the next futures contract (e.g., a long would purchase one May 2011 Contract to create a long position there). In this example, the trader would sell one March contract and buy one May contract.

52.     Traders who do not roll generally find ample liquidity to establish new positions during the time of the rolls. Given the foregoing facts, it is most likely that Defendants purchased their long May 2011 Contract positions by late March 2011. Due to a similar sequence of open interest and trading in the July 2011 Contract; it is most likely that Defendants purchased their July 2011 Contracts by late May 2011.

### 4.     In Order To Stop Such High Amounts of Deliveries, Defendants Turned Down Lower Priced Cotton Available on THE SEAM Cash Market

53.     With regard to the separation of cotton futures contract prices and cotton cash market prices, cotton in the cash market was very freely available during April-July 2011. This was due to cancellations of export orders near-term demand for cotton, and increases in near-term supplies of cotton. In fact, cotton was being repeatedly offered in the cash market at lower prices than those in the futures market.

24

54.    For example, during April-May 2011, there were contemporaneous offers of substantial higher quality cotton on The SEAM market (www.theseam.com), a public web-based physical cotton trading platform, than potentially would have been delivered on cotton futures contracts. In fact, there is a very wide variety of cotton qualities that could be delivered on the cotton futures contract. Therefore, the cotton actually received on a cotton futures contract delivery could be unusable under many export contracts and many domestic contracts. Moreover, the cotton on The SEAM was offered at a significantly lower price than the May 2011 Contract price.

55.    Indeed, Defendants' threatened insistence on much higher-amounts of deliveries than were in (or could be timely added to) the certificated stocks, also caused offers of physical cotton on The SEAM market (see ¶¶57-63, *infra*), and in other cash markets, in the form of exchanges for physical ("EFP"). In these particular EFP's, the physical cotton would be exchanged for May 2011 Contract long positions.

56.    These offers were made at prices that were substantially less than May 2011 Contract prices, and in which the cotton was available more quickly than the potential availability of cotton through ICE. But Defendants nonetheless uneconomically refused to purchase the lower priced, high quality cotton available on The SEAM and in other cash markets. Instead, Defendants insisted upon deliveries of the high priced May 2011 Contract which meant uncertain quality at an uncertain date while foregoing artificially high priced sales of the May 2011 Contract in order to satisfy Defendants' May 2011 Contract long positions. This caused May 2011 Contract prices to further diverge from cash market prices rather than converging with cash market prices as future prices usually do when delivery approaches.

25

57.     For example, by April 13, 2011, the May/July spread was approximately 16.71¢/lb in backwardation. An offer of physical cotton inventory was made on The SEAM. The total volume offered was 151,728 bales of cotton or 1,517 futures contracts equivalent. The offer price was $2.50/bale (or a total of $379,320) cheaper than the equivalent of taking delivery of the ICE or the "board" (taking physical cotton through the futures mechanism). About 30% of the physical cotton offered was in fact already certified cotton (cotton already certified to be delivered against the ICE cotton futures contract from the First Notice Day). The balance of the offer was of ICE certifiable quality.

58.     The offer was on the basis of EFP. Again, an EFP is an Exchange for Physical in which, in this instance, the buyer receives the physical cotton and seller received a long position in the May 2011 Contract. The load-out date for the cotton was guaranteed before June 30. This was substantially earlier than the latest load-out date for May 2011 ICE certificated stocks under the ICE warehouses' 63 day rule. Despite the availability of this cheaper equivalent, Defendants did not purchase this cotton offered on April 13.

59.     **April 15, 2011**. The May/July spread was approximately 18.12¢/lb in backwardation. The volume offered on The SEAM was increased to 303,408 bales of cotton or 3,034 futures contracts equivalents. More than 30% of this offer was already ICE certificated cotton stock and the balance was ICE certifiable quality cotton. The SEAM-based offer was priced at a discount to (i.e., a "few" percentage points below) taking delivery on ICE. But once again, despite the availability of this cheaper equivalent or preferred cotton, Defendants did not purchase this cotton offered on April 15.

26

60.    **April 9, 2011**. The May/July spread was approximately 18.66¢/lb in backwardation. In addition to the substantial volume of cotton offered on The SEAM, 300,000 bales of cotton or 3,000 "futures contracts equivalent of certifiable quality cotton were also offered directly to the trade (including, to Allenberg/LDC, Olam, Cargill and Noble) with The SEAM acting as the broker. The terms and price of such offer were far more economic than taking delivery on ICE. As of this April 19 date, there were now 600,000 bales of cotton offered directly to the market at a price that was $10.00/bale more attractive than "ICE parity" or so called "board parity". This was $6.0 million more attractive than taking delivery on the ICE. Despite the availability of this cheaper and preferred cotton, Defendants did not purchase this cotton offered on April 19.

61.    Plaintiff has good reason to believe and alleges that through May 2011, there were 800,000 bales of physical cotton offered to Defendants, 300,000 on The SEAM and 500,000 offered directly. Notwithstanding the substantial price, quality, and other advantages inherent in such offers, Defendants overwhelmingly refused to accept or otherwise purchase the foregoing offers of cotton. Further, Defendants did not solicit cash market offers for sales of cotton notwithstanding the much lower prices in the cash market during the time of the offers on The SEAM.

62.    Similarly, during the period from June 7 to July 7, 2011 inclusive, prices in the cash market were dramatically lower than even the July 2011 Contract prices. However, less physical cotton was offered on The SEAM during the lead up to First Notice Day on the July 2011 Contract than for the May 2011 Contract. This was because of the failure to obtain any

27

significant transactions or positive results from the offers of physical cotton on the May 2011 Contract, as alleged in ¶¶ 52-57, *supra*.

63.     If Defendants were acting economically, they would have purchased the lower priced cotton in the cash market and sold their higher priced futures contracts on the ICE. Instead, Defendants acted uneconomically and intentionally manipulated and artificially inflated first, May 2011 Contract prices and, later, July 2011 Contract prices.

### 5.     The Non-Convergence of Futures and Cash Market Prices; The Much Lower-Priced Cotton Available in the Cash Markets

64.     In addition to distorted spreads between futures contracts, another, lesser indication of manipulation is distorted spreads between cash market prices and futures prices. However, cash markets frequently will price directly off of the futures price. For this and other reasons, some cash market prices sometimes do not provide an independent benchmark with which to measure or evaluate the futures market price.

65.     **Record Divergence Instead of Expected Convergence**. During the Class Period, the May 2011 Contract and the July 2011 Contract prices each diverged significantly cash market prices other than the previously-alleged SEAM prices. These, include the following two series of cash market cotton prices: (a) USDA 1 1/6 inch SLM cotton deliverable in Memphis, Tennessee and (b) USDA 1 inch SLM cotton deliverable in Memphis, Tennessee. *See infra.*

66.     **USDA Cash Market Cotton  11/16 Inch SLM Deliverable In Memphis**.

(a) **May 2011 Cotton Futures Contract**. For the time period of April 1 - May 6 for the twelve years of 2000 through 2011, the top twelve highest spreads between the May cotton futures contract price and the cash market cotton price were all in the May 2011 Contract. The largest

28

spread during this time period was 20.80¢ on April 28, 2011. This spread was almost three times the highest spread between 2000 and 2010, inclusive. It was more than five times the average spread price during the 2000-2010 period. The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May, 2011 is a classic badge of manipulation.

(b) **July 2011 Cotton Futures Contract**. For the time period of June 1- July 6 for the twelve years of 2000 through 2011, the top thirteen highest spreads between the July cotton futures contract and the cash marker cotton price were all in the July 2011 Contract. The largest spread during this time period was 32.05¢ on June 23, 2011. This spread was almost five times more than the highest spread between 2000 and 2010 inclusive. It was more than ten times the average spread price during the same time period. The unprecedented spread between the prices of the July 2011 Contract price and the cash market cotton price in June and July, 2011 is a classic badge of manipulation.

       67.    **USDA Cash Market Cotton 1 Inch SLM Deliverable In Memphis**.

(a) **May 2011 Cotton Futures Contract**. For the time period of April 1 - May 6 for the twelve years of 2000 through 2011, the top fourteen highest spreads between the May cotton futures contract and the cash market cotton price were all in the May 2011 cotton futures contract. The largest spread during this time period was 19.63¢ on May 3, 2011. This spread was more than two times the highest spread in all the years prior to 2011 back to 2000. It was more than four times the average spread price during the same time period. The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May 2011 is a classic badge of manipulation.

(b) **July 2011 Cotton Futures Contract**. For the time period of June 1- July 6 for the twelve years of 2000 through 2011, the top thirteen highest spreads between the July cotton futures contract and the cash market cotton price were all in the July 2011 cotton futures contract. The largest spread during this time period was 32.34¢ on June 23, 2011. This spread was more than four times the highest spread in all the years prior to 2011 back to 2000. It was more than eight times the average spread price during the same time period. The unprecedented spread between the prices of the July 2011 Contract price and the cash market cotton price in June and July 2011 is a classic badge of manipulation.

68.     Next, Defendants also caused record distortions between the May 2011 Contract price and an index of cash market prices in export markets.

69.     Moreover, Plaintiff alleges below a chart showing the "A-Index" price (an average of the five cheapest offers of various origins, including United States cotton on a CNF Far East basis[4]) compared to May 2011 Contract price.



70.     As the chart indicates the contract and futures prices usually move closely in tandem. However, during 2011, the relationship between the A-Index price and the May 2011

---

[4] CNF is when the seller pays for all freight charges to destination port, after that the buyer pays all costs for clearance customs duties and transport.

Contract price completely separated and disconnected leading up to the May 2011 Contract First Notice Day.

71.     These distorted price relationships as well as the quality and availability differentials and the capacity constraints alleged herein, further made it very economic for Defendants to do the following. They should have sold their high-priced May 2011 Contracts and, later, their high priced July 2011 Contracts, and purchased cotton at the lower prices in the cash markets.

### 6.     Divergence from Fundamentals Of Supply and Demand

#### a)     Old Crop

72.     Futures prices and cash market prices influence one another. Therefore, the foregoing dramatic deviations between May 2011 Contract prices and cash market prices, or July 2011 Contract prices and cash market prices, understate the artificiality of the futures prices.

73.     Demand is directly related to price. That is, as demand decreases, prices tend to fall (all other things equal). Supply is inversely related to price. That is, as supply increases, prices tend to fall (all else equal).

74.     During March-July 2011, there were large numbers of cancellations of cotton sales orders occurring in the United States. Not only was the overall number of cancellations high. There were also a very high amount of net cancellations and net cancellations of exports.[5]

---

[5] Plaintiffs' "net cancellations of exports" data was obtained from the USDA Export Sales Query System. Net cancellation of exports refers to what the USDA calls "net sales." The USDA defines "net sales" as: "[t]he sum total resulting from new export sales, increases resulting from changes in destination, decreases resulting from changes in destination, decreases resulting from

And there was an extreme constancy of the net cancellations of exports: in 15 out of 16 weeks, there were net cancellations. This showed that demand for cotton was plummeting.

75.    **Net Cancellations of Exports**. From March until August 2011 and continuing thereafter, the USDA reported net cancellations of exports of United States cotton. *See fn.* 5. The net cancellation of export orders unexpectedly freed up cotton in the cash market.

76.    From March 18 through March 31, 2011 there were 49,170 running bales of net cancellations; April 2011 had 185,235 running bales of net cancellations; May 2011 had 110,727 running bales of net cancellations; June 2011 had 342,054 running bales of net cancellations; July 2011 had 153,864 running bales of net cancellations. *See* USDA's Foreign Agricultural service Export Sales Reporting, http://www.fas.usda.gov/esrguery/.

77.    Between March and April 17, 2011, cancellations exceeded old-crop sales in four out of five weeks. See http://lubbockonline.comeditoral-columnist/2011-04-17/howell-export-sales-cancellations-contribute-cotton#.T7UKk8WrHdl. By July 17, 2011, new sales had been exceeded by cancellations in 15 of the last 16 weeks. http://lubbockonline.com/agriculture/2011-07-17/howell-global-demand-issues-hammer-cotton-export-outlook-dims#.T7UOmMWrHdl.

78.    (a) On July 17, 2011, there were unprecedented United States old-crop export sales cancellations. *Id.*

---

purchases from foreign sellers, and cancellations resulting from contract adjustments, buybacks, loading tolerances, changes in marketing year, or change in commodity."

32

(b) Defendants did make during the First Quarter of 2011 (i) export contracts that were cancellable at Defendants' option, and (ii) export contracts in which Defendants had an option as to the exact time of shipment.

(c) But Plaintiff does not know whether any of the extraordinary number of cancellations reported on July 17, 2011 was issued by a Defendant. If Defendants tried to justify taking large deliveries on the May 2011 Contract and/or July 2011 Contract in order to satisfy an export sale and if that sale was both cancelable at a Defendant's option and in fact cancelled, then this would tend to add to the inference of manipulation.

(d) Even if Defendants knew they could use and intended to use some or all of the cotton received on delivery of the May 2011 Contract or July 2011 Contract to fulfill supposed fixed time cotton export contracts that had to be shipped at those times, Defendants acted uneconomically for the reasons alleged herein. This includes that Defendants refused to liquidate their long futures positions to the extent of the large deliveries they stopped, notwithstanding the availability of cheaper cotton on the cash market than through taking such deliveries on the long futures contracts.

79.     The record U.S. export cancellations confirm that the U.S. domestic market in general and specifically ICE Cotton No. 2 May 2011 (and later, July 2011) futures contracts were the most attractive sale price and destination for US cotton worldwide. That is, ICE No. 2 was offering the best price to "sell" US cotton to, and the worst price to "buy" US cotton from. But to the extent of the deliveries they stopped, Defendants uneconomically refused to sell their long positions at these best selling prices, and instead overpaid to purchase cotton at these worst buying prices for cotton.

80.     USDA statistics show that the amount of actual cotton available at August 1, 2011 compared to the amount the USDA had projected in March 2011 to be available on August 1, 2011, constituted the highest March 1 - August 1 increase since at least 1990.

81.     The foregoing large decrease in actual and near-term demand for cotton and large increase in the actual and near-term supply of cotton meant that prices of cotton for immediate and near-term delivery should fall relative to prices for delivery further into the future.

82.     In fact, the projected amount of cotton in the carryout from the 2010 crop was increasing steadily between April and July. This and the other facts alleged herein should have caused the prices of old crop cotton to decrease relative to the prices of new crop cotton.

### b)     New Crop

83.     Meanwhile, the USDA projected crop size for the new 2011 crop declined by 11% between April and July 2011. This meant that, all other things equal, prices for new crop cotton (i.e., from August 1, 2011) forward should increase relative to the price of old crop cotton (i.e., cotton delivered before August 1, 2011).

84.     Thus, the fundamentals for the old crop (¶¶72-82) and the fundamentals for the new crop (¶83) both indicated that the prices of the expiring futures contract (first, the May 2011 Contract and, later, the July 2011 Contract) price should become much lower relative to the prices of later expiring futures contracts.

### c)     <u>Spreads Moved In The Opposite Direction Of That Indicated By The Fundamentals</u>

34

85.     However, Defendants' uneconomic conduct (including their insistence upon record ratios of deliveries relative to certificated stocks) caused price relationships to move in the opposite direction.

86.     Controlling for USDA forecast carryout, the May-July backwardation in May 2011 and the July-December backwardation in July 2011 were extreme and unprecedented as compared to the 1990/91 -- 2009/10 crop years.

87.     In May 2011, the May-July spread was approximately 20 cents higher than would be expected given (a) the relation between the May-July spread and USDA projections of carryout during the 1990-2010 period, and (b) the USDA projected carryout as of May 2011. The t-statistic here is 30, which is very highly statistically significant. The probability that this would be observed by chance in a competitive market is infinitesimal and involves many more zeroes than are listed in the probability alleged below for the July 2011 Contract.

88.     In early-July 2011, the July-December 2011 spread was approximately 34 cents higher than would be expected given (a) the relation between the July-December spread and USDA projections of carryout during the 1990-2010 period, and (b) the USDA projected carryout as of early-July, 2011. The t-statistic on this difference is highly statistically significant. The t-statistic is 12.75, which would almost never be observed by chance in a competitive market (the probability is on the order of .0000000000001).

89.     In a competitive market, increasing backwardation should be associated with stock drawdowns. This is because, as the present cotton becomes much more valuable or higher priced than cotton in two to three months, the rational economic actors hurry to sell their cotton at the relatively high prices now available. Such sales are preferable to continuing to pay

35

storage, insurance and 19 other charges to hold the cotton in warehouses for months until the lower prices are projected to materialize.

90.     During the delivery period on the May 2011 Contract, deliverable cotton stocks were rising while the backwardation was increasing. This is not expected in a competitive market. Rising backwardations should be associated with deliverable cotton stock drawdowns. This also indicates a manipulated market.

91.     The price and deliverable cotton stock movements were highly anomalous, a badge of manipulation, and not consistent with normal competitive market behavior.

36

7.    **Comparison Of Average Spreads In 2011 To Average Spreads in 2010**

a)    **May Contract**

92.    The USDA reported (using the USDA's December 2011 World Agricultural Supply and Demand Estimates report) U.S. carryout stocks at 2.95 million bales as at July 31, 2010.  In comparison, the US carry out stocks as at July 31, 2011 were 2.60 million bales, only slightly less than the prior year.  Over the 1990-2010 period, differences in carryout of .35 million bales across years are associated with far smaller differences in spreads across these years, including years with low levels of carryout than the differences alleged below.

93.    The May, 2011 Contract price during the last trading days prior to the First Notice Day[6] of such contract, was greater than the price of the July 2011 Contract on the corresponding dates.

| Days To FND | Trade Date | May 2011 Contract-Closing Price | July 2011 Contract-Closing Price | Differential |
|---|---|---|---|---|
| 11 | 4/8/2011 | 202.97 | 189.9 | (13.07) |
| 10 | 4/11/2011 | 204.58 | 190.91 | (13.67) |
| 9 | 4/12/2011 | 199.73 | 185.57 | (14.16) |
| 8 | 4/13/2011 1 | 197.35 | 180.64 | (16.71) |
| 7 | 4/14/2011 | 196.04 | 178 | (18.04) |

_____

[6] Data obtained by Plaintiff from ICE does not reflect closing prices for these contracts on April 22, 2011.

| 6 | 4/15/2011 | 195.52 | 177.4 | (18.12) |
| 5 | 4/18/2011 | 196.45 | 178.16 | (18.29) |
| 4 | 4/19/2011 | 189.82 | 171.16 | (18.66) |
| 3 | 4/20/2011 | 183.17 | 167.06 | (16.11) |
| 2 | 4/21/2011 | 186.67 | 167.51 | (19.16) |
| 1 | 4/25/2011 | 188.08 | 166.39 | (21.69) |

94.    Thus, the average difference, which was a backwardation, as reflected in column

4 above, was (17.06) cents per pound.

95.    The May 2010 Contract price for each of the last eleven trading days prior to the

First  Notice Day of such contract, was less than the price of the July 2010 Contract.

| Days To FND | Trade Date | May 2010 Contract | July 2010 Contract | Differential |
|---|---|---|---|---|
| 11 | 4/12/2010 | 78.13 | 79.63 | 1.50 |
| 10 | 4/13/2010 | 80.03 | 81.61 | 1.58 |
| 9 | 4/14/2011 | 79.5 | 81.09 | 1.59 |
| 8 | 4/15/2010 | 80.5 | 82.12 | 1.62 |
| 7 | 4/16/2010 | 80.01 | 81.59 | 1.58 |
| 6 | 4/19/2010 | 79.85 | 81.6 | 1.75 |
| 5 | 4/20/2010 | 82.35 | 84.6 | 1.75 |
| 4 | 4/21/2010 | 83.04 | 85.15 | 2.11 |
| 3 | 4/22/2010 | 82.42 | 84.82 | 2.40 |
| 2 | 4/23/2010 | 84.26 | 86.2 | 1.94 |
| 1 | 4/26/2010 | 84.02 | 85.89 | 1.87 |

96.     Thus, the average difference, which was a carrying charge, was 1.79¢ per pound. Accordingly, although the ending stocks were comparable in 2010 and 2011, the May 2010 Contract actually showed a carrying charge, but in 2011 dramatically switched to a record backwardation.  This was due to Defendants' unlawful manipulation and artificial inflation of May 2011 Contract prices.

       **b)**    **July - December Spread**

97.     The July 2011 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the December 2011 Contract on the corresponding dates.

| Days Prior To FND | Trade Date | July 2011 Contract | December 2011 Contract Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 133.65 | (16.38) |
| 10 | 6/13/2011 | 150.95 | 131.58 | (19.37) |
| 9 | 6/14/2011 | 155.54 | 131.78 | (23.76) |
| 8 | 6/15/2011 | 151.96 | 125.8 | (26.16) |
| 7 | 6/16/2011 | 145.96 | 120.18 | (25.78) |
| 6 | 6/17/2011 | 145.18 | 123.77 | (21.41) |
| 5 | 6/20/2011 | 148.73 | 124.07 | (24.66) |
| 4 | 6/21/2011 | 154.73 | 124 | (30.73) |
| 3 | 6/22/2011 | 161.22 | 121.45 | (39.77) |
| 2 | 6/23/2011 | 164.55 | 119.4 | (45.15) |
| 1 | 6/24/2011 | 165.22 | 121.92 | (43.30) |

98.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (28.77) ¢ per pound.

99.     The July 2010 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the December 2010 Contract on the corresponding dates.

| Days To FND | Trade Date | July 2010 Contract- Closing Price | December 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2010 | 82.51 | 79.07 | (3.44) |
| 10 | 6/11/2010 | 81.54 | 78.94 | (2.60) |
| 9 | 6/14/2010 | 82.56 | 79.47 | (3.09) |
| 8 | 6/15/2010 | 81.97 | 79.62 | (235) |
| 7 | 6/16/2010 | 81.77 | 79.7 | (2.07) |
| 6 | 6/17/2010 | 80.8 | 79.42 | (1.38) |
| 5 | 6/18/2010 | 81.78 | 78.95 | (2.83) |
| 4 | 6/21/2010 | 82.15 | 79.17 | (2.98) |
| 3 | 6/22/2010 | 82.46 | 79.21 | (3.25) |
| 2 | 6/23/2010 | 84.45 | 78.16 | (6.29) |
| 1 | 6/24/2010 | 84.48 | 7.8.72 | (5.76) |

100.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.28)¢ per pound. Although the end of year supplies were comparable, the backwardation in 2011 was almost nine times greater than that in 2010. This was due to Defendants' unlawful manipulation and artificial inflation of the July 2011 contract prices.

101.   The July 2011 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the October 2011 Contract on the corresponding dates.

| Days Prior to FND | Trade Date | July 2011 Contract Closing Price | October 2011 Contract Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 139.67 | (10.36) |
| 10 | 6/13/2011 | 150.95 | 139.58 | (11.37) |
| 9 | 6/14/2011 | 155.54 | 138.54 | (17.00) |
| 8 | 6/15/2011 | 151.96 | 133.45 | (18.51) |
| 7 | 6/16/2011 | 145.96 | 127.46 | (18.50) |
| 6 | 6/17/2011 | 145.18 | 129.61 | (15.57) |
| 5 | 6/2012011 | 148.73 | 129.29 | (19.44) |
| 4 | 6/21/2011 | 154.73 | 130.33 | (24.40) |
| 3 | 6/22/2011 | 161.22 | 128.22 | (33.00) |
| 2 | 6/23/2011 | 164.55 | 125 | (39.55) |
| 1 | 6/24/2011 | 165.22 | 126.92 | (38.30) |

102.   Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (22.36)¢ per pound.

103.   The July 2010 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the October 2010 Contract on the corresponding dates.

41

| Days Prior to FND | Trade Date | July 2010 Contract Closing Price | October 2010 Contract Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 82.51 | 78.564 | (3.87) |
| 10 | 6/11/2011 | 81.54 | 78.53 | (3.01) |
| 9 | 6/14/2011 | 82.56 | 79.15 | (3.41) |
| 8 | 6/15/2011 | 81.97 | 79.32 | (2.65) |
| 7 | 6/16/2011 | 81.77 | 79.28 | (2.49) |
| 6 | 6/17/2011 | 80.8 | 79.16 | (1.64) |
| 5 | 6/2012011 | 81.78 | 78.56 | (3.22) |
| 4 | 6/21/2011 | 82.15 | 78.91 | (3.24) |
| 3 | 6/22/2011 | 82.46 | 79.39 | (3.07) |
| 2 | 6/23/2011 | 84.45 | 79.56 | (4.89) |
| 1 | 6/24/2011 | 84.48 | 79.39 | (3.07) |

104.    Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.27)¢ per pound.

105.    In other words, the backwardation in 2011 was seven times greater than that in 2010. This notwithstanding comparable amounts of carry-out supplies of old crop cotton in 2010 and 2011, and declining near-term demand during 2011.

   **E.    Defendants Monopoly Power.**

106.    The relevant market is the long position in the expiring ICE cotton futures contract or the market for taking deliveries on such Contract.  From March 30 until the end of May 2011, this was for the May 2011 Contract.

107.    From June 7 until the end of July 2011, this was for the July 2011 Contract.

42

108.    Defendants attempted and conspired to monopolize and did monopolize the relevant market.  During May and July 2011, Defendants acquired more than 99 percent of the relevant market.

109.    Defendants did so through restrictive and anticompetitive means, including paying uneconomically high prices for cotton and forcing deliveries to happen on the May 2011 Contract and July 2011 Contract that could have been satisfied much more cheaply in the cash market.

110.    Through such violation, Defendants uneconomically and restrictively obtained and exercised control over prices, first, of the May 2011 Contract and, later, of the July 2011 Contract.

111.    Defendants' price control over the May 2011 Contract and the July 2011 Contract reflects monopoly power and collusion.

**F.     Cotton On-Call Contracts**

112.    A Cotton On-Call Contract is a contract in which all the specifications are set except for the final fixed price of the cotton.  The price is based on premiums or discounts ("on" or "off") in a specified month of the ICE Cotton No. 2 futures contract.

113.    The base price of the cotton will remain unfixed until the buyer instructs the seller to buy (fix) futures in order to establish the final contract price by adding the JCE futures fixation level to the contract "on call", "on" or "off" basis.

114.    "Basis" is the difference between the cash price and the futures price, for the time, place and quality where delivery actually occurs.

43

115.    "Call cotton" refers to physical cotton bought or sold, or contracted for purchase or sale at a price to be fixed later based upon a specified delivery month future's price.

116.    The CFTC publishes a weekly report entitled the "Cotton On-Call Report" which shows the quantity of call cotton bought or sold on which the price has not been fixed, together with the respective futures on which the purchase or sale is based.

117.    By inflating prices, first, of May 2011 Contracts and, later, of July 2011 Contracts, Defendants damaged persons who had bought cotton on call and were forced to fix their such contracts at artificially high prices relative to the other prices alleged herein.

118.    Specifically, persons who purchased cotton on call contracts based on the May 2011 Contract, and set the price between March 30 and May 6, 2011 paid artificially high prices. Persons who purchased cotton on call contracts based on the July 2011 Contract, and set the price between June 7 and July 7, 2011 also paid artificially high prices.

G.      **Motive**

119.    Plaintiff disclaims any burden to plead Defendants' motive in manipulating prices. But Plaintiff has good grounds to believe and does allege as follows. In manipulating a public market, it is better to work in concert with associates. *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 775 (S.D.N.Y. 1984), *aff'd* 768 F.2d 22 (2d Cir. 1985). The record backwardation and dislocations that Defendants relentlessly caused, during the periods from March 30 to May 6, 2011 and from June 7 to July 7, 2011, enabled Defendants to gain financially from, first, the artificially high May 2011 Contract prices and, later, the artificially high July 2011 Contract prices compared to Defendants' financial return if normal price relationships had prevailed.

120.    ICE futures prices are publicly reported in interstate commerce throughout the United States and the world. They affect shipments of cotton in interstate commerce.

121.    During the Class Period, purchasers in interstate commerce of, first, May 2011 Contracts or the cotton-on-call contracts based thereon, and, later, July 2011 Contract or the cotton-on-call contracts based thereon, paid the artificially high prices caused by Defendants.

122.    The unlawful agreements and acts alleged herein have had the foregoing and additional substantial additional anticompetitive effect on interstate commerce within the United States.

123.    The monopoly, unlawful agreements, and other anticompetitive conduct restrained commerce inflated May 2011 Contract prices relative to other prices inflated July 2011 Contract prices relative to other prices, and otherwise burdened commerce.

## V.    CLASS ALLEGATIONS

124.    Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons, corporations and other legal entities that (a) purchased between March 30 and May 6, 2011, a May 2011 Contract in order to liquidate a short position in such contract, including short positions held as part of spread positions; or (b) contracted to purchase cotton on call based on the May 2011 Contract price, and set the price on this contract between March 30 and May 6; or (c) purchased between June 7 and July 7, 2011 a July 2011 Contract in order to liquidate a short position therein, including short positions held as part of spread positions; or (d) contracted to purchase cotton on call based on the July 2011 Contract price, and set the price on this contract between June 7 and July 7, 2011.

Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.[7]

125.   The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to Plaintiff, but can be readily ascertained Plaintiff believes that there are hundreds of members of the Class.

126.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the quest ions of law and fact common the Class are:

a.   Whether Defendants manipulated the prices of ICE cotton futures contracts in violation of the CEA;

b.   Whether Defendants aided and abetted manipulation in violation of the CEA;

c.   Whether such manipulation caused prices of ICE cotton futures contracts to be artificial;

d.   Whether injury or the extent of such artificiality may be established by common, Class-wide means, including, for example, by regression analysis econometric formula, or other economic tests;

e.   Whether Defendants monopolized, attempted to monopolize or conspired to monopolize the relevant market;

f.   Whether Defendants combined, conspired and agreed to fix the prices of the May 2011 Contract or the July 2011 Contract;

g.   Whether such violations inflated the prices of such contracts;

---

[7] Plaintiff reserves the right to amend the definition of the Class in the class certification motion or otherwise.

h.   Whether such violation inflated the price of cotton on call contracts relative to other prices;

i.   Whether such inflation caused antitrust injury to the property of Plaintiff and Class members; and

j.   Whether damages, restitution, equitable, compulsory, or other relief is warranted.

127.   Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent.  Plaintiff and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

128.   Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel experienced in complex commodity futures manipulation and antitrust class actions.  Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

129.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

130.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

47

131.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Plaintiff anticipates no difficulty in the management of this action as a class action.

## VI.    DEFENDANTS' ANTITRUST VIOLATIONS

132.    Beginning on approximately March 30, 2011, and continuing until at least May 6, 2011, and again beginning on approximately June 7, 2011 and continuing until at least July 7, 2011, the exact dates being unknown to Plaintiff, Defendants and their unknown co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress, and/or stabilize the prices of, first, the May 2011 Contract and, later, the July 2011 Contract.

133.    Also, Defendants attempted and conspired to monopolize, and did monopolize, almost 100% of the relevant market.

134.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive, restrictive and exclusionary activities, the purpose and effect of which were to restrain trade in, fix, or manipulate ICE cotton futures and options contracts. These activities included the following:

a.    Defendants took deliveries on (i) 3,898 of 3,928 May 2001 Contracts (99.23% of stops by all clearing member firms), and (ii) 1,613 of 1,629 July 2011 Contracts (99.01% of stops by all clearing member firms);

b.    Defendants acted uneconomically by taking delivery on May 2011 LCE Cotton No. 2 contracts while rejecting offers at lower prices for substantial amounts of equivalent physical cotton prior to the First Notice Day of such contract;

48

c.   Defendants acted uneconomically by taking delivery on July 2011 ICE Cotton No. 2 contracts because substantial amounts of equivalent physical cotton were available in the cash market prior to the First Notice Day of such contract;

d.   Defendants otherwise knowingly and collusively acted in order to restrain trade with or through its co-conspirators.

## VII.   ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

135.   The Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiff and other members of the Class were deprived of normal competitive trading patterns. Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

### COUNT ONE
## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
### (7 U.S.C. § 1 ET. SEQ.) AGAINST ALL DEFENDANTS

136.   Plaintiff repeats and re-alleges the previous allegations as if fully set forth herein.

137.   (a) Each Defendant acted in whole or in part through Defendant Term Commodities, Inc. and/or by virtue of each Defendant's ownership of, control over, directions to, or conduct in concert with Defendant Term Commodities, Inc. Defendants intentionally manipulated and artificially inflated May 2011 Contract prices and July 2011 Contract prices.

(b) In the same manner, Defendants also intentionally exacerbated and abused the pre-existing conditions of (1) the relatively low supplies of cotton certificated for delivery on ICE, and (2) the considerable capacity constraints arising from the amount of time that was required to certificate new cotton for delivery on ICE. This intentional exacerbation and abuse

49

further manipulated, artificially inflated and exacerbated the manipulation of May 2011 Contract prices and July 2011 Contract prices.

138.    According to "Cotton traders probed on squeeze", a Financial Times article by Gregory Meyer and Javier Bias (http://www.ft.com/cms/s/0/e2b9f84c-a4eb-11e1-b42l-00144feabdc0.html#axzzlzCt64310):

(a) "Louis Dreyfus Commodities", through its Allenberg subsidiary, was a dominant buyer of ICE cotton futures contracts and dominant stopper of deliveries in the May 2011 Contract and the July 2011 Contract;

(b) Louis Dreyfus Commodities and Allenberg each acted, in whole or in very substantial part, through Defendant Term Commodities Inc.;

(c) The CFTC Division of Enforcement is investigating whether the May 2011 Contract or the July 2011 Contract prices were manipulated. This includes by means of a large amount of deliveries. The CFTC Division of Enforcement is reportedly also investigating whether cotton was available to Louis Dreyfus Commodities and/or Allenberg in the cash markets at lower prices than the prices of the future contracts.

139.    As previously alleged, cotton was available in the cash markets at substantially lower prices than the prices, respectively, of the May 2011 Contract and July 2011 Contract. See ¶¶53-71, *supra*. Moreover, large volume offers of cotton were made on The SEAM market in which Defendants, through Defendants Allenberg and Nicosia, were leading participants. See ¶¶53-62, *supra*.

140.  **Role of Each Defendant**.  Plaintiff has good grounds to believe and does allege as follows. First, Defendant Nicosia controlled and made the decision for Allenberg to acquire large long positions and stop large amounts of deliveries to satisfy such long positions in the May 2011 Contract and the July 2011 Contract.

141.  Second, Defendant Allenberg purchased its large long positions and took its large deliveries, in whole or in large part, through Defendant Term Commodities. Defendant Allenberg was a person acting on behalf of, and a person owned or controlled by Defendants Louis Dreyfus Commodities B.V. and Louis Dreyfus Commodities LLC.

142.  Third, Defendants Louis Dreyfus Commodities B.V. and Louis Dreyfus Commodities LLC (a) acted through Defendant Allenberg and other affiliates to manipulate prices as alleged herein, and/or (b) knowingly and intentionally provided, directly or indirectly, financial assistance, credit, credibility, physical facilities and other assistance to such manipulation.

143.  The Defendants were not neophytes in the cotton market. Each well knew of the price distortions and the other publicly available information. Each actually knew or actually received reports indicating the cotton futures contract positions and conduct of Allenberg, Term Commodities, Inc., and their affiliates. Each had readily available to them the full information regarding such long positions and deliveries. With such knowledge, each Defendant undertook and/or continued its conduct to allow and further the manipulation.

144.  Defendants undertook the activities alleged herein individually, in concert, and as one another's principal, control person, agent, or otherwise acting on behalf of one another within the meaning of Section 2(a)(l)(b) of the CEA, 7 U.S.C. §2(a)(1)(B).

145.    Each Defendant or its control person or principal or agent or a person acting on its behalf specifically intended their activities alleged herein to move or support the prices of, first, May 2011 Contract prices to that artificial levels and, later, move or support July 2011 Contract prices to or at artificial levels.  As a direct result of such intentional conduct, Defendants' conduct caused such prices and the price trends to be artificial during the Class Period.

146.    In each of the foregoing ways as well as in others, Defendants manipulated ICE cotton futures contract prices in violation of Sections 6(c), 6(d), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a) and 25(a) during the Class Period.

147.    Thereby, Defendants proximately caused Plaintiff and members of the Class injury for which each is entitled to recover the actual damages resulting from the manipulation and other violations of the CEA.

## COUNT TWO
## AIDING AND ABETTING AND CONTROL PERSON LIABILITY FOR MANIPULATION AGAINST ALL DEFENDANTS NOT LIABLE UNDER COUNT ONE

148.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

149.    To any extent that any Defendant is not liable under Count One, then that Defendant is liable under this Count.  The price distortions alleged herein were publicly available during the Class Period.  Each Defendant knowingly rendered substantial assistance to such manipulation.

150.    Defendant Louis Dreyfus Commodities B.V. was the holding company of Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

52

151.    Defendant Louis Dreyfus Commodities LLC is the holding company for various operating companies engaged in LDC's North American businesses of Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

152.    Defendant Term Commodities, Inc. was the clearing member for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

153.    Defendant Allenberg Cotton Co. is a wholly owned division or company of LDC, which is engaged in cotton merchandising for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

154.    Defendant Joseph Nicosia, at all times relevant herein, was the Chief Executive Officer of Allenberg Cotton Co. and is the Senior Platform Head Cotton of the Louis Dreyfus Commodities Executive Group. He willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

155.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

156.    Defendants willfully intended to assist the manipulation in violation of the CEA.

157.    Additionally or alternatively, Defendants Louis Dreyfus Commodities B.V., Louis Dreyfus Commodities LLC; Term Commodities Inc., Allenberg Cotton Co., and Joseph Nicosia controlled other Defendants. As a controlling person, each of the aforementioned Defendants is liable under Section 2(a)(l)(B) of the CEA, 7 U.S.C. § 2(a)(l)(B), Section 4(b) of the Commodity

Exchange Act, 7 U.S.C.§ 6(b), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), and 17 C.F.R. § 166.3.

158.    Plaintiff and members of the Class are each entitled to damages for the violations alleged herein.

## COUNT THREE
## VIOLATIONS OF SECTION 1 AND/OR SECTION 2 OF THE SHERMAN ANTITRUST ACT AGAINST ALL DEFENDANTS

159.    Plaintiff incorporates by reference the preceding allegations.

160.    In violation of Section 1 of the Sherman Act, Defendants entered an agreement, understanding or concerted action between and among Defendants. In furtherance of this agreement, Defendants fixed and artificially inflated prices for, first, the May 2011 Contract, and, later, the July 2011 Contract. Defendants' conduct constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

161.    In violation of Section 2 of the Sherman Act, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market as previously alleged herein.

162.    This conduct and its resulting impact on the market, including the market for cotton on call contracts, occurred in or affected interstate and international commerce.

163.    As a direct and foreseeable result, Plaintiff and Class members were injured in their property in that they had to pay artificially high prices for May 2011 Contracts, or July 2011 Contracts, or cotton on call contracts that were based on the prices of the May 2011 Contract or the July 2011 Contract.

54

## COUNT FOUR
## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

164.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

165.    Defendants financially benefited from their unlawful acts. These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact cotton contracts at artificial prices.

166.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

167.    Each Defendant should pay its own unjust enrichment to Plaintiff and members of the class.

168.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class Counsel;

(B)    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiff and the Class treble damages against Defendants as a result of their unlawful anticompetitive conduct alleged herein under applicable federal antitrust law;

(D)     For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(E)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(F)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)     For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated:   July 12, 2012                              Respectfully submitted,

**HAUSFELD LLP**

By: _____
      Seth R. Gassman (SG-8116)
Michael D. Hausfeld
William P. Butterfield
Timothy S. Kearns
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Fax: (202) 540-7201
sgassman@hausfeldllp.com
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
tkearns@hausfeldllp.com
sgosselin@hausfeldllp.com

*Attorneys for Plaintiff William Meierfeld*

57